USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/29/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GRISEL PENA LEBRON,

    Plaintiff,

  -against-

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

18-CV-125 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

  Plaintiff Grisel Pena Lebron filed this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act (the Act), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 11) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 16, 28.) For the reasons set forth below, plaintiff's motion will be denied, defendant's motion will be granted, and the case will be dismissed.

## I. BACKGROUND

### A. Procedural Background

  On August 6, 2013, plaintiff submitted an application for DIB. *See* SSA Administrative Record (Dkt. No. 14) (hereinafter "R. __"), at 536-37. On August 19, 2013, plaintiff submitted an application for SSI. (R. 538-46.) In both applications, plaintiff asserted disability as of June 12, 2010 due to seizures, depression, bipolar disorder, stomach ulcers, and post-traumatic stress disorder (PTSD). (R. 536, 538, 581.) Both claims were denied on November 25, 2013. (R. 294-301.) Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (R. 302),

after which ALJ Seth I. Grossman held hearings on July 23, 2015, February 12, 2016, August 17, 2016, and January 11, 2017. (R. 161, 174, 198, 237.)

In a written decision dated January 27, 2017 (Decision), the ALJ found that plaintiff's disability claim was barred under the doctrine of *res judicata* as to the period April 5, 2010 through September 16, 2011 (the date the Commissioner denied a prior disability application by plaintiff). (R. 16; *see also* R. 248-64.) As to the remaining period at issue (September 17, 2011 to the date of the Decision), the ALJ determined that plaintiff was not disabled within the meaning of the Act. (R. 15-31.) On March 7, 2017, plaintiff requested Appeals Council review. (R. 533.) The Appeals Council denied that request on November 7, 2017 (R. 1), making the ALJ's determination final.

## B.     Personal Background

Plaintiff was born on March 29, 1968 in Puerto Rico (R. 536, 735), and was 45 years old at the time of her applications for benefits. According to plaintiff, she had a troubled and violent upbringing. When she was three, she was taken away from her abusive mother to live with her grandmother. (R. 223, 576.) When she was eight, her grandmother passed away, and she went to live on the street. (R. 223-24.) At either eight or nine, she was a victim of rape. (R. 224, 576.) Despite these difficulties, she completed a high school-level education. (R. 179-80, 212-13, 748.) She relocated to the mainland United States as a teenager. (R. 176.)

Since then, she has suffered from epilepsy and depression, and has been hospitalized several times as a result of suicidal ideations and other psychiatric issues. (R. 576, 621, 635.) She also became a regular user of marijuana (beginning as teenager), crack cocaine, and heroin (both beginning in her twenties or thirties). (R. 678, 689, 694, 743-44, 893, 1493, 1500, 1507.) At age 36, she was again a victim of rape, and gave birth to a second child, a girl. (R. 224.)[1]

---

[1] The evidence concerning when plaintiff gave birth to her first child, a boy, is inconsistent. Plaintiff testified at the July 23, 2015 hearing that her son was 39 years old – and the product of

2

Plaintiff's earning records reflect that she worked for a variety of employers between 2000 and 2010. (R. 548, 550-53.) She last worked at a laundromat. (R. 213, 583.) She stopped working there on or around April 5, 2010, either as a result of her seizure disorder or because the laundromat closed down. (*Compare* R. 1008 *with* R. 1150.)

During the relevant time period, plaintiff lived with her young daughter in a homeless shelter for women with children. (R. 578, 763.) Notwithstanding plaintiff's epilepsy and psychiatric issues, plaintiff cooked, cleaned, shopped, went outside, and socialized on a regular basis. (R. 747, 1003, 1152.) She was also able to take public transportation by herself (R. 572, 1008, 1150, 1152), and to take her daughter to and from school. (R. 214-15.)

## II.     THE MEDICAL RECORD

### A.     Treatment Records

The record contains over one thousand pages of treating notes and other medical records from multiple health care providers. Plaintiff and the Commissioner have each provided a summary of that evidence. *See* Pl. Mem. (Dkt. No. 17) at 2-13; Def. Mem. (Dkt. No. 19) at 2-12. The parties' summaries do not materially conflict, except in their characterization of the frequency of plaintiff's seizures and plaintiff's compliance with the seizure medication she was prescribed. *Compare* Pl. Mem. at 14-16 *with* Def. Mem. at 15-18. The Court adopts the parties' summaries, except as to those issues. The portions of the treatment records that are pertinent to the adjudication of this case, including those related to plaintiff's seizures, are discussed in section V below.

---

her being raped at the age of 8 or 9 – but plaintiff's psychiatrist noted in 2013 that her son was 22, and noted in 2014 that he was 23, which would mean that plaintiff was approximately 23 years old when he was born. (*Compare* R. 224, 823 *with* R. 733, 1021.)

**B.   Medical Opinion Evidence**

**1.   Dr. Lindenbaum**

On February 2, 2011, treating neurologist Yelena Lindenbaum, M.D. completed a Treating Physician's Wellness Plan Report concerning plaintiff. (R. 810-11.)[2] Dr. Lindenaum diagnosed seizures and noted that the frequency of plaintiff's seizures had recently gone up from five per year to five per month. (R. 810.) Nonetheless, Dr. Lindenbaum found that plaintiff was "employable with work limitations," including that she not operate heavy machinery, drive, work around heights, or supervise children or the elderly. (R. 811.) On May 1, 2011, Dr. Lindenbaum completed another Treating Physician's Wellness Plan Report (R. 812-13), in which she noted that plaintiff had six seizures per month, but that it was "unknown" whether plaintiff took her prescribed medication. (R. 812.)

**2.   Dr. Lubrano**

On June 24, 2012, psychiatrist Arcangelo A. Lubrano, M.D. completed a Treating Physician's Wellness Plan Report (R. 853-54), in which he opined that plaintiff was unable to work for at least 12 months. (R. 854.) On April 3, 2013 – weeks before plaintiff was hospitalized for suicidal ideations (*see* R. 623-732) – Dr. Lubrano observed in a treating note that plaintiff was decompensating and unable to concentrate, would probably need psychiatric hospitalization, and was not capable of working. (R. 621.)

On October 16, 2014, Dr. Lubrano completed a Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairment(s). (R. 1016-20.) Under "[f]requency and length of contact," he reported "monthly since 2009." (R. 1016.) He diagnosed schizophrenia and seizure

---

[2] Dr. Lindenbaum provided her opinion before the start of the time period at issue in the Decision. (R. 16.) The Court nonetheless notes the opinion of Dr. Lindenbaum, who appears to have had a longstanding treatment relationship with plaintiff (R. 1051), as background information.

disorder. (R. 1016.) He assessed 25 symptoms, including sleep disturbance, personality change, mood disturbance, anhedonia or pervasive loss of interest, suicidal ideations or attempts, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility and irritability (*id.*), and noted that plaintiff was prescribed Ambien, Celexa, Risperdal, Zyprexa, and Klonopin. (R. 1017.)

Dr. Lubrano found that plaintiff's impairments caused an extreme or marked loss in her ability to perform each of thirteen work-related mental activities related to understanding, remembering, and carrying out instructions. (R. 1018.) He also found that plaintiff's impairments caused an extreme or marked loss in her ability to perform each of eleven work-related mental activities related to responding appropriately to supervision, coworkers, and work pressures in a work setting. (R. 1018-19.) He then opined that plaintiff had a "slight" restriction in her activities of daily living, "moderate" difficulties in maintaining social functioning, "constant" deficiencies of concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner, and "continual" episodes of deterioration or decompensation in work or work-like settings. (R. 1019-20.) He also predicted that plaintiff would be absent from work more than three days per month. (R. 1017.) Finally, he noted that plaintiff's condition had existed and persisted, with the restrictions identified in the Medical Source Statement, since 1998. (R. 1020.)

Notwithstanding these findings, Dr. Lubrano wrote that plaintiff remained "stable on present regime," and was oriented, pleasant, cooperative, and well related, with no evidence of delusions, though she had some hallucinations and suicidal ideations. (R. 1017.) He also assessed that plaintiff would be able to manage benefits in her own best interest. (R. 1020.)

On June 13, 2013 and October 27, 2014, Dr. Lubrano completed Psychiatric Evaluation forms for plaintiff's housing purposes. (R. 733, 1021-22.) On these forms, he stated that plaintiff

had been a patient of his since only November 2011 (R. 733, 1021), and stated that she "remain[ed] compliant with her medication." (R. 733, 1021.)

Throughout the relevant time period, Dr. Lubrano frequently assessed plaintiff's Global Assessment of Functioning (GAF) score. He reported that plaintiff had a GAF score of 55 on January 29, 2013, June 13, 2013, and October 27, 2014. (R. 622, 733, 1021.) On numerous other dates, he reported a score of 70 (though in each instance he may have been referring to a score assessed on May 20, 2013). (*See* R. 1289-91, 1388-89, 1392-93, 1394-95, 1416-17, 1432-34, 1439-40, 1465-67, 1468-70, 1471-73, 1478-80.)[3]

### 3. Dr. Lee

In October 2012, plaintiff was evaluated by internist Jee Lee, M.D. through Federation Employment and Guidance Service (FEGS). Dr. Lee opined that plaintiff was unable to travel alone and "might not be able to work at this moment" due to her "frequent seizure[s]." (R. 784.) In December 2012, in connection with another FEGS evaluation, Dr. Lee opined that plaintiff's work restrictions included a "low stress environment, avoid driving/operating heavy machinery,

---

[3] "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed. rev. 2000) ("DSM-IV")). A GAF score in the range of 51 to 60 indicates "moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers)," while a GAF score in the range of 61 to 70 "indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 405 n.1, n.3 (quoting DSM-IV at 34) (quotation marks omitted). The Fifth Edition of the DSM discarded the use of GAF scores, *id.*, and in 2013 the SSA issued a bulletin limiting the use of GAF scores in disability proceedings, noting that "there is no way to standardize measurement and evaluation." SSA, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication," AM-13066 (July 22, 2013), *revised* (Oct. 14, 2014). However, the Commissioner may still consider GAF scores as one factor among others. *Mitchell v. Colvin*, 2015 WL 5306208, at *12 (S.D.N.Y. Sept. 10, 2015).

avoid dangerous heights/fire." (R. 871.) He also noted that plaintiff required being around limited numbers of people, and was unable to travel during rush hour. (R. 872.)

### 4.    Lincoln Medical and Mental Health Center

Three physicians from Lincoln Medical and Mental Health Center (Lincoln Medical), where plaintiff received treatment for her seizures approximately once every six months, provided opinions about plaintiff's condition.

On December 7, 2012, neurologist James Zisfein, M.D. completed a Treating Physician's Wellness Plan Report, and found that, notwithstanding her seizures, plaintiff was employable with work limitations. (R. 846-47.) He did not specify what those limitations were. (*Id.*)

On or about April 19, 2013, plaintiff was hospitalized at Lincoln Medical for suicidal behavior and depression. (*See* R. 623-732.) She had been using "a lot of drugs" (R. 647), including cocaine, opiates, and marijuana. (R. 675.) She was discharged on April 30, 2013. (R. 728.)

On August 29, 2014, neurologist Andrew A. Burger, M.D., who had treated plaintiff approximately every six months since 2012, and during her April 2013 hospitalization (R. 632-34), completed a Seizures Impairment Questionnaire. (R. 1012-15.) Dr. Burger reported that plaintiff suffered from tonic clonic seizures once per month, after which she would need to rest for two hours. (R. 1012.) He found that plaintiff was able to work on a full-time basis, but should avoid heights and hazards. (*Id.*) He also opined that plaintiff could sit for more than six hours, stand for five to six hours, walk for one to two hours, lift 21-50 pounds occasionally, and that she would be absent from work less than once per month, though she would "sometimes" need to lay down or rest during the workday. (R. 1014-15.)

On July 22, 2015, neurologist David Sternman, M.D., who treated plaintiff on July 23, 2014 and July 22, 2015, completed a Seizures Impairment Questionnaire. (R. 1120-23.) Dr. Sternman reported that plaintiff suffered from seizures four times per month. (R. 1120.) He found

that plaintiff was incapable "of even low stress work." (*Id.*) He opined that plaintiff could sit three to four hours, stand or walk one to two hours, and lift 11-20 pounds frequently. (R. 1122-23.) He also stated that plaintiff would need to lay down and rest for two hours several times monthly, and would be absent from work more than three times per month. (*Id.*) However, he reported that plaintiff had a normal brain MRI and EEG, and stated that it was "not yet known" whether plaintiff's impairments were "*reasonably consistent* with the symptoms and functional limitations described in the evaluation." (R. 1121 (emphasis in original).)

### 5. Dr. Gearhart

On October 25, 2013, preventative medicine physician Shannon Gearhart, M.D. performed a consultative Internal Medicine Examination of plaintiff. (R. 1002-06.) Plaintiff informed Dr. Gearhart of her seizures, including that she had seizures both the day before and two days before the examination. (R. 1002.) Dr. Gearhart noted that plaintiff was able to cook, clean, shop, do laundry, shower, dress, and bathe independently. (R. 1003.) The physical examination yielded largely normal results, and Dr. Gearhart diagnosed seizure disorder, headaches, and knee pain. (R. 1005.) She opined that plaintiff had "mild restrictions for repetitive stair climbing," and should, due to her seizures, avoid operating machinery or motor vehicles and "any activities that might increase her risk of falling." (R. 1005.)

### 6. Dr. Mahony

On November 13, 2013, psychologist David Mahony, Ph.D. performed a consultative Psychiatric Evaluation of plaintiff. (R. 1008-11.) Plaintiff reported that she had insomnia, depression, and a history of suicidal ideations. (R. 1008.) Dr. Mahony noted that plaintiff had "cognitive deficits, secondary to psychiatric symptoms and substance abuse," and "concentration difficulties, short-term memory deficits, and difficulty learning new material." (R. 1009.) Plaintiff

denied past or present problems with substance or alcohol abuse, notwithstanding recent records revealing "a positive toxicology for cocaine, opiates, and cannabis." (R. 1010.)

On examination, plaintiff was "evasive," but her appearance and speech were normal and adequate, her thought processes were coherent, and her affect was appropriate. (R. 1009-10.) Plaintiff's mood was euthymic, her sensorium was mildly impaired, and her attention, concentration, and recent and remote memory skills were impaired "due to psychiatric and substance abuse problems." (*Id.*) Her cognitive functioning was below average, and her insight and judgment were poor. (R. 1010.)

Dr. Mahony diagnosed cognitive disorder and major depressive disorder, with a "poor" prognosis because plaintiff was "not acknowledging her substance abuse problems." (R. 1011.) He found "no evidence of limitation in the claimant's ability to follow and understand simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, or maintaining a regular schedule, [but] moderate difficulties learning new tasks, performing complex tasks independently, making appropriate decisions, relating to others, and dealing with stress." (R. 1010.) He also found that plaintiff's substance abuse, psychiatric, and cognitive problems would "interfere with the claimant's ability to function on a daily basis." (*Id.*)

### 7. Dr. Kamin

On November 21, 2013, state agency medical reviewer Edward Kamin, Ph.D. provided his opinion in connection with the SSA's initial evaluation of plaintiff's applications for benefits. (R. 283.) After listing diagnoses of epilepsy, substance abuse, and affective disorder, he opined that plaintiff had mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and "one or two" episodes of decompensation, each of extended duration. (*Id.*) He found plaintiff "moderately limited" in her abilities to understand and remember detailed instructions, to carry out detailed

instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 286-87.) He also found plaintiff moderately limited in her abilities to respond appropriately to changes in the work setting and to be aware of normal hazards and take appropriate precautions. (R. 287.) However, he found that plaintiff was "not significantly limited" in any of the various other tasks he considered. (R. 286-87.) He opined that plaintiff was capable of performing unskilled entry level work. (R. 287.)

### 8. Dr. Rupp-Goolnick

On September 16, 2015, psychologist Arlene Rupp-Goolnick, Ph.D. performed another consultative Psychiatric Evaluation of plaintiff. (R. 1150-53.) Plaintiff denied suicidal ideations, panic attacks, or manic symptoms. (R. 1150.) Dr. Rupp-Goolnick noted short-term memory deficits and concentration difficulty. (*Id.*)

On examination, plaintiff was cooperative, her appearance and speech were normal and adequate, her thought processes were coherent, her affect was appropriate, her mood was neutral, and her attention, concentration, and recent and remote memory skills were intact. (R. 1151-52.) Her cognitive functioning was below average. (R. 1152.)

Dr. Rupp-Goolnick diagnosed bipolar disorder with a prognosis of "[g]ood, given fully functional." (R. 1153.) She found no evidence of limitations in plaintiff's ability to "[f]ollow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress." (R.

1152.) She wrote that Lebron's psychiatric problems did not appear to be "significant enough to interfere with the claimant's ability to function on a daily basis." (*Id.*)

On the same day, Dr. Rupp-Goolnick completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (R. 1154-56.) She found no limitations to plaintiff's ability to do any work-related task described on that form. (*Id.*)

## III. HEARING TESTIMONY

### A. July 23, 2015

Plaintiff first appeared before ALJ Grossman, with counsel, on July 23, 2015. (R. 198-236.) She testified primarily in English, with a Spanish interpreter on standby. (R. 201.)

Plaintiff testified that she could not work due to her seizures. (R. 215.) She stated that her last seizure was the night before the hearing, despite the fact that she took her medication, and that she usually got seizures "[l]ike three times a week." (*Id.*) She testified that she started having three seizures per week "three months ago," and that her doctors had recently increased her medication dosage, which had helped. (R. 215-16.)

Plaintiff reported that she had recently been hospitalized in a psychiatric ward for several weeks. (R. 220.) She testified that she had hallucinations and heard voices that "someone is going to kill me." (R. 221.) On examination by her attorney, plaintiff stated that the slashes on her wrist were from her depression. (R. 225.) She stated that she had difficulty sleeping. (R. 227.) She further stated that she sometimes felt like people were out to get her, that she sometimes could not focus and concentrate, and that she got mad easily. (R. 227-28.)

The ALJ directed plaintiff to attend a consultative psychiatric examination and closed the hearing.

## B. February 12, 2016

On February 12, 2016, after her consultative examination with Dr. Rupp-Goolnick, plaintiff appeared for a second time, with counsel, before ALJ Grossman. (R. 161-73.) Plaintiff did not testify. Instead, the ALJ observed that the record was still missing relevant documents from Bronx Lebanon Hospital, and closed the hearing.

## C. August 17, 2016

On August 17, 2016, plaintiff failed to appear for her third scheduled hearing in front of ALJ Grossman. (R. 237-47.) Plaintiff's counsel – a different attorney from the same firm, who had not submitted a required representation form – advised the ALJ that the plaintiff was "at Promesa, which is a program that she recently was admitted to." (R. 239.) The ALJ stated that counsel had two weeks to submit additional records in support of plaintiff's application, and that the ALJ might or might not hold another hearing in the matter because "[a]s far as I'm concerned we have a complete record." (R. 245.)

## D. January 11, 2017

On January 11, 2017, plaintiff appeared again, with counsel, before ALJ Grossman. (R. 174-97.) Plaintiff testified through a Spanish interpreter. (R. 176.) She testified that she had epileptic attacks, seizures, depression, schizophrenia, bipolar disorder, PTSD, anxiety, and panic attacks. (R. 180.) She testified that she also got migraines, and sometimes had crying spells up to once or twice a day. (R. 182-83.) She said she had flashbacks. (R. 184.) She also stated that she had been hospitalized multiple times for trying to hurt herself, including in 2015. (R. 185-86.)

Plaintiff began testifying about her daily activities – including cooking and cleaning – before suddenly stating that she wished to leave the hearing. (R. 187.) In response to her attorney asking why, she said: "Because he [the ALJ] is bothering me . . . Too many dumb questions. I've seen them several times. These questions have been asked 20 million times. Not going to do

anything." (*Id.*) After conferring with plaintiff, plaintiff's counsel represented that she was "not feeling up to doing this hearing" and that she waived her right to the hearing. (R. 188.)

## IV.     THE ALJ'S DECISION

### A.     Standards

A claimant is "disabled," within the meaning of the Act, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). In order to determine whether a claimant over the age of 18 is disabled within the meaning of Act, the Commissioner is required to apply a five-step evaluation process pursuant to 20 C.F.R. §§ 416.920(a)(4) and 404.1520(a)(4). In order, the steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014); *Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant

numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity (RFC), age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1512(f) (2015), 404.1560(c), 416.912(f) (2015), 416.960(c).[4]

Prior to steps four and five, the ALJ must determine the claimant's RFC, that is, the "most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

### B.    Application of Standards

Before turning to the required five-step analysis, the ALJ made two preliminary determinations. First, he dismissed plaintiff's application as to the period June 12, 2010 through September 16, 2011 under the doctrine of *res judicata*, because plaintiff filed an earlier application alleging the same facts and issues in June 2010, and that application was denied by ALJ Zachary Weiss in a decision dated September 16, 2011. (R. 15-16.) The ALJ found no basis for reopening the earlier application. (*Id.*) The ALJ therefore determined that the earliest onset date that he could consider was September 17, 2011. (*Id.*)

Second, the ALJ found that plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2012," which was her date last insured. (R. 16.) Thus, the ALJ held that plaintiff had to "establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits." (*Id.*)

---

[4] 20 C.F.R. §§ 404.1512 and 416.912 were amended effective March 27, 2017. In this Opinion and Order, I quote and I apply the regulations as they existed at the time of the Commissioner's Decision. Citations to regulations that have since been amended include the date of the version that was in effect at that time.

Turning to the first step of the five-step evaluation process, the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since September 17, 2011. (R. 18.)

At step two, the ALJ found that plaintiff suffered from the following severe impairments: "a seizure disorder, affective disorders, and polysubstance (crack/cocaine, heroin, and cannabis) dependence." (R. 18.)

At step three, the ALJ concluded that none of plaintiff's physical or mental impairments met or medically equaled the severity of any of the listed impairments (Listings). (R. 18-19.) As relevant here, the ALJ found that plaintiff's seizure disorder did not meet Listing 11.02 (epilepsy), because "the evidence [did] not establish that the claimant's seizure disorder [was] characterized by seizures of the nature or occurring with the frequency" of that Listing. (R. 19.) According to the ALJ, the evidence instead showed that plaintiff's seizures were "well controlled with medication, except when she [was] not compliant with anti-seizure medication and not [sic] using illicit drugs." (R. 21.) The ALJ's "close review of the medical record reveal[ed] that the claimant's complaints of increasing breakthrough seizures and psychiatric symptoms correlate[d] with periods of escalating substance use, which, in turn, led to noncompliance with prescribed medication." (R. 26.)

Before turning to steps four and five, the ALJ concluded that plaintiff had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[5] except:

> [S]he is limited to simple routine and repetitive work tasks, with no exposure to heights or dangerous machinery. For the above type jobs, the claimant can understand and carry out instructions, maintain attention and concentration, interact

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

appropriately with supervisors, coworkers and the public, and keep a regular schedule, all within normal work expectations.

(R. 20.)

In determining plaintiff's RFC, the ALJ found that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not supported by the medical evidence." (R. 25.) He based this determination on plaintiff's substance abuse, her activities of daily living, and her "numerous inconsistent statements," including, among others, that she (a) "both reported and denied completing high school," (b) testified that she spoke only minimal English, a fact "not borne out by the record," (c) "both denied a history of arrest or incarceration, and reported that she was incarcerated for eight years," (d) "stated that she did not socialize with others, and that she socializes and spends time with friends," and (e) "habitually [] denied illicit substance use" to various medical professionals. (R. 26-27.)

The ALJ then weighed the medical opinion evidence in the record. As to plaintiff's treating physicians, he accorded "limited" weight to Dr. Lindenbaum's opinion that plaintiff was employable with limitations, because it predated the period at issue. (R. 27.) He accorded "some" weight to Dr. Zisfein's opinion, noting that it did not provide specific work limitations (instead stating generally that plaintiff was employable with limitations), but was "fully consonant with the overall medical record." (*Id.*) He gave "significant" weight to Dr. Burger's assessment, "to the extent he indicated the claimant had the ability to sit, stand, walk, lift, and carry, at the light level of exertion, but should avoid heights and hazards, and was not likely to be absent even one day a month." (R. 28.)

The ALJ accorded the opinion of Dr. Sternman (which he spelled "Sternum") weight "only to the extent it is consistent with the overall neurological records." (R. 28.) He did so because he found that Dr. Sternman was "a non-treating neurologist who did not address the effects of the

claimant's noncompliance with treatment and substance use," and because Dr. Sternman "qualified his opinion by stating he could not ascertain whether the claimant's seizure disorder was reasonably consistent with the symptoms and assessed limitations." (*Id.*)[6]

The ALJ accorded "little" weight to Dr. Lubrano's opinions concerning plaintiff's mental impairments. (R. 28-29.) He found Dr. Lubrano's 2012 report stating that plaintiff was unable to work for at least 12 months "too conclusory to merit any weight as a medical opinion." (R. 28.) However, he accepted "Dr. Lubrano's April 2013 statement that the claimant was not capable of working in the days preceding her April 2013 decompensation in the context of heroin use." (*Id.*) He gave "little" weight to Dr. Lubrano's 25 "check marks" in his October 2014 Medical Source Statement ("indicating . . . that the claimant had nearly every sign or symptom and marked to extreme functional limitations in every work-related area"), as inconsistent with the treatment records, which showed that plaintiff "was psychiatrically stable when compliant with prescribed medication" and "did not evidence most of the checked signs and symptoms." (R. 28-29.) He also found that Dr. Lubrano's contemporaneous treatment notes did not support the conclusion that plaintiff "could not have worked at any time since 1998 if the check marks were an accurate assessment of her limitations." (R. 29.) Further, he noted that Dr. Lubrano gave plaintiff "GAF scores of 55, which indicates moderate symptoms or limitations, as well as scores as high as 70, indicating she had only mild symptoms or limitations." (*Id.*)

Turning to the opinions of the consultative examiners, the ALJ accorded "substantial" weight to Dr. Gearhart's opinion that plaintiff "had at most mild exertional limitations but should avoid activities or work that might put her at risk," since it was "fully consonant with the overall

---

[6] The question of whether Dr. Sternman qualified as a "treating physician" under the regulations is discussed in section V, below.

medical record." (R. 27.) He gave "significant" weight to Dr. Mahony's opinion "that the claimant had at most moderate work-related limitations stemming from her combined psychiatric and substance abuse conditions," since that opinion was consistent with his reading of Dr. Lubrano's treatment records and GAF assessments, "indicating the claimant had mild or moderate symptoms or limitations." (R. 28.) He gave "substantial" weight to Dr. Rupp-Goolnick's opinion that plaintiff had "no mental limitations," noting that while it was "supported by the normal objective findings" and comported "generally with the normal findings in the mental health treatment records," it did not "consider the effects of the claimant's substance abuse (which the claimant did not disclose)." (R. 29.) He then gave "substantial" weight to Dr. Lee's opinions provided in connection with plaintiff's FEGS evaluations, including that plaintiff could work "with appropriate work limitations to accommodate the seizure disorder and depressive disorder," because they were "consistent with the record, including Dr. Burger's December 2012 progress note indicating the claimant's seizure disorder was controlled, and the January 2013 mental health records showing the claimant's mental symptoms had resolved and she was stable." (R. 28.) However, the ALJ did not accept Dr. Lee's opinion that plaintiff required travel accommodations, because it was "contradicted by the record, including the claimant's self-described activities." (*Id.*)

The ALJ also considered the opinion of non-examining state agency medical reviewer Dr. Kamin. He accorded "substantial" weight to Dr. Kamin's opinion that plaintiff could "perform unskilled entry-level work." (R. 29.)

Finally, the ALJ weighed the GAF scores throughout the record, which ranged as low as 25 (when plaintiff was hospitalized in April 2013) (R. 642), and as high as 70 (only one month later) (R. 1196). (R. 29.) He "gave weight to the GAF scores by Dr. Lubrano to the extent of

accepting the treating psychiatrist's judgment that when the claimant is compliant with prescribed medication, she has at most moderate, and often only mild, mental symptoms or limitations." (*Id.*)

At step four, the ALJ found that plaintiff was "unable to perform any past relevant work." (R. 29.)

At step five, the ALJ found that considering plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy" that plaintiff could perform. (R. 30.) He found that plaintiff's "nonexertional limitations" did not "significantly diminish her ability to perform work at the light level of exertion," and that plaintiff did not have "a substantial loss of ability to perform the basic mental tasks associated with unskilled work." (*Id.*) He therefore relied on the Medical-Vocational Guidelines and found plaintiff "not disabled" under the Act. (*Id.*)[7]

## V.    ANALYSIS

### A.    Standard of Review

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by

---

[7] Because the ALJ found plaintiff not disabled, he did "not reach the question of the materiality of her substance use." (R. 27.) However, he noted: "even I were to find that the claimant was not able to work, I would find this was due to her substance abuse, not to a psychiatric impairment independent of the substance use disorder." (*Id.*)

substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at \*1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at \*6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at \*21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at \*8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at \*8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, remand may be appropriate if the ALJ fails to provide an adequate "roadmap" for his reasoning. But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

## B.    The Parties' Contentions

Plaintiff makes five principal arguments. First, she contends that the ALJ erred in finding that plaintiff did not meet or equal Listing 11.02. Pl. Mem. at 14-16. Second, she argues that the ALJ failed to properly weigh the psychiatric opinions in the record. *Id*. at 16-20. Third, she asserts that the ALJ erred in his statement that even if he had found plaintiff unable to work, he would have found that this was due to her substance abuse. *Id.* at 20-22. Fourth, she argues that the ALJ erred in his step five determination in applying the Medical-Vocational Guidelines, rather than having a vocational expert testify. *Id*. at 22-23. Last, she contends that the ALJ denied her right to a full and fair hearing by "showing an unshakeable commitment to denying her claim" throughout the agency proceedings. *Id.* at 23-25.[8]

_____

[8] Plaintiff does not challenge the ALJ's finding that she was not credible. And for good reason: substantial evidence supported that determination. The ALJ correctly noted that plaintiff "both denied a history of arrest or incarceration, and reported that she was incarcerated for eight years." (*Compare* R. 1009, 1151 *with* R. 621, 1021.) She stated at one time that she stopped work due to

The Commissioner counters that the ALJ's Listing 11.02 determination, RFC finding, and ultimate determination that plaintiff could perform jobs in the national economy were legally correct and supported by substantial evidence. Def. Mem. at 14-25.

The Court addresses the issues raised by the parties in the order presented by plaintiff.

### C.     Substantial Evidence Supported the ALJ's Listing 11.02 Determination

"For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). The claimant bears the burden to make the necessary showing. *Kaczkowski v. Colvin*, 2016 WL 5922768, at *22 (S.D.N.Y. Oct. 11, 2016) (citing *Sullivan*, 493 U.S. at 530).

The question for this Court is whether substantial evidence supported the ALJ's conclusion that plaintiff's impairments do not meet or medically equal the impairments listed in the regulations. *Johnson*, 563 F. Supp. 2d 444 at 455. Even the "absence of an express rationale" from the ALJ does not prevent a court "from upholding the ALJ's determination regarding [a plaintiff's] claimed listed impairments," if "portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982).

At the time of the ALJ's Decision, Listing 11.02 provided, in relevant part:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C) . . .

---

her condition, and at another time that she stopped work because her place of employment closed. (*Compare* R. 1008 *with* R. 1150.) She also denied her history of illicit substance use during Dr. Mahony's consultative examination. (R. 1009.)

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.02(A) (2017). When counting seizures under Listing 11.02(A), the period "cannot begin earlier than one month after you began prescribed treatment." *Id.* Multiple seizures occurring in a 24-hour period are counted as one seizure. *Id.* Further, seizures occurring during a period when a claimant is not adhering to prescribed treatment will not be counted "without good reason." *Id.*

Under Listing 11.02(A), therefore, the Court must address two distinct questions: first, whether plaintiff had seizures "occurring at least once a month for at least 3 consecutive months" during the relevant period, and second, whether those seizures occurred "despite adherence to prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.02(A) (2017); *see also Bolden v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 152, 163 (E.D.N.Y. 2007) ("adherence with prescribed medical treatment is an essential element of the medical listing for convulsive epilepsy and, accordingly, its absence prevents a seizure disorder from being considered a listed impairment").

Between September 17, 2011 and the date of the Decision, the frequency of plaintiff's reported seizures varied significantly, and sometimes approached and may have exceeded "once a month for at least 3 consecutive months." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.02(A) (2017). In a May 14, 2012 treatment note, Dr. Burger wrote that plaintiff's seizures occurred once every more than two months. (R. 967.) An October 3, 2012 note in a FEGS report stated that plaintiff had seizures "every month." (R. 775.) On November 13, 2012, plaintiff reported that she "used to get 6 seizures in a month [] but now she reported 3 seizures in a month." (R. 960.) On December 18, 2012, Dr. Burger wrote in a treating note that plaintiff had no seizures in the last month, and that her epilepsy was "controlled currently" with medication. (R. 957.) On April 3, 2013, plaintiff reported "11 seizures this year," though she did not report if any of those seizures occurred on the same day(s). (R. 1181.) On April 23, 2013, while plaintiff was hospitalized, Dr. Burger reported

that she "had multiple seizures this morning" but noted that her seizures had been occurring once every two months. (R. 632-33.) On June 6, 2013, Dr. Burger noted that "as per patient she has had 3 seizures [sic] episodes in one month." (R. 954.) On October 23, 2013, plaintiff reported having had six seizures in two months. (R. 1235.)

On January 21, 2014, plaintiff reported having seizures twice a month, despite compliance with medication. (R. 1317.) On June 5, 2014, plaintiff reported "often 3-5 seizures a day, now that [she] has been off her Keppra." (R. 1383.) In his August 29, 2014 Seizures Impairment Questionnaire, Dr. Burger noted that the frequency of plaintiff's seizures was one per month. (R. 1012.) On July 23, 2014, Dr. Sternman noted that the frequency of plaintiff's seizures was "once every 2 months, or more often." (R. 1058.) On February 6, 2015, Dr. Burger noted a seizure frequency of "twice in six months." (R. 1137.) On July 22, 2015, in a Seizures Impairment Questionnaire, Dr. Sternman noted a frequency of four per month. (R. 1120.) On September 30, 2015, however, plaintiff reported that she had had only one seizure episode since July 22, 2015, and Dr. Sternman's treatment note from that date reflects that "[s]eizure frequency had not change [sic], '1 seizure every once in a while.'" (R. 1276.) On December 9, 2015, plaintiff reported to her gynecologist that she had "[e]pilepsy, last episode 2 months ago, 6-7 episodes in one year." (R. 1267.)

This record therefore reveals a possibility (though not a certainty) that plaintiff had the requisite frequency of seizures during the relevant period to meet Listing 11.02(A). However, as explained below, the record also contains substantial evidence to support the ALJ's conclusion that those seizures did not occur once per month "despite adherence to prescribed treatment."

A May 14, 2012 treatment note from Lincoln Medical reported that plaintiff had run out of her seizure medication two months before, and noted that her seizures were under "good control

except when [she] does not take medication[]." (R. 968.) On April 23, 2013, during plaintiff's psychiatric hospitalization, Dr. Burger wrote that plaintiff had initially been prescribed Dilantin but "got tired of taking medication," and noted a continuing "question of compliance." (R. 633.) The same day, attending physician Rajinder Kumar Garg, M.D. noted, "compliance to meds variable." (R. 629.) Another April 2013 note reflects that plaintiff stated she "misses days with her meds." (R. 632.)

On October 23, 2013, plaintiff reported being on Keppra and Neurontin,[9] and stated she had six seizures in two months, but that "due to being stressed" she had not "had the time" to go back to her neurologist. (R. 1235.) Similarly, on January 21, 2014, she reported compliance with her medication and continued seizures twice a month, but acknowledged she had missed an appointment with her neurologist. (R. 1317-18.) On June 5, 2014, when she reported that she was having 3-5 seizures a day since she was "off" Keppra, the same note included that "[w]hen she is on it, if she takes it for several months at a time, she'll have them rarely." (R. 1383.) On July 23, 2014, Dr. Sternman noted that "compliance has been an issue," and that plaintiff "readily admits to forgetting doses and ran out altogether two months ago." (R. 1058.) A June 25, 2015 Inpatient Addiction MD Discharge Note/Summary from Bronx Lebanon Hospital Center reflected that one of plaintiff's "perceived negative consequences of substance use" was to "stop taking her medications." (R. 1485-86.) On July 22, 2015, Dr. Sternman reported that he was not clear which

---

[9] Keppra (levetiracetam) is an antiepileptic drug which is indicated "as adjunctive therapy in the treatment of partial onset seizures in adults and children 1 month of age and older with epilepsy." *Keppra*, RxList, https://www.rxlist.com/keppra-drug.htm (last visited March 29, 2019). Neurontin (gabapentin) is also an "[a]djunctive therapy in the treatment of partial onset seizures, with and without secondary generalization, in adults and pediatric patients 3 years and older with epilepsy." *Neurontin*, RxList, https://www.rxlist.com/neurontin-drug.htm (last visited March 29, 2019.)

version of Keppra plaintiff had been taking. (R. 1146.) On February 8, 2016, plaintiff was "stable on present regime." (R. 1468.)

Together, these reports constitute substantial evidence to support the ALJ's determination that plaintiff did not have the required frequency of seizures "despite adherence to prescribed treatment." To be sure, there is evidence in the record suggesting that plaintiff was at times compliant with her medication regime (*see* R. 719 ("[f]air compliance with regimen"), 1188 ("compliant with medication as prescribed"), 1227 (same), 1427 ("[r]eports 100% compliance")); moreover, Dr. Zisfein and Dr. Lubrano each noted that plaintiff took her prescribed medication. (R. 846, 853.) But that is not the test. Where, as here, the evidence is mixed – and substantial evidence supports the ALJ's factual finding concerning the frequency of plaintiff's seizures despite her adherence to prescribed treatment – the Court must defer to that finding and uphold the ALJ's Listing 11.02(A) determination. *See Gonzalez v. Astrue*, 2008 WL 4453166, at \*7 (E.D.N.Y. Sept. 30, 2008) (upholding ALJ's step three determination where the claimant had "admitted that he sometimes forgets to take his medication" and where "the record contain[ed] numerous instructions from his doctors urging and reminding him to take his medication, and document[ed] at least one instance of non-compliance"); *Vazquez v. Apfel*, 1998 WL 542324, at \*5-6 (S.D.N.Y. Aug. 24, 1998) (upholding ALJ's step three determination, despite "conflicting reports regarding the frequency" of a claimant's seizures, in part because of evidence that the claimant failed to take all prescribed medication). *See also Pitts v. Colvin*, 2014 WL 12599801, at \*9 (W.D.N.C. Sept. 26, 2014) ("the ALJ here properly evaluated Plaintiff's epilepsy/seizures . . . that decision required consideration of numerous medical records, many of which reveal inconsistencies. It was the ALJ's duty to weigh all the evidence and to resolve any conflicts"), *report and recommendation adopted*, 2014 WL 12607833 (W.D.N.C. Dec. 3, 2014).

**D.      The ALJ Did Not Err in Weighing the Medical Opinion Evidence**

When evaluating medical opinion evidence to inform a claimant's RFC, an ALJ must generally give more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. §§ 404.1527(c)(1) (2012), 416.927(c)(1) (2012). Similarly, an ALJ must generally give more weight to the opinion of a source who treated a claimant than a source who did not. 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012). If an ALJ finds a treating source's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence" in the record, the ALJ must give that opinion controlling weight under the treating physician rule. 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012). That rule recognizes that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2) (2012), § 416.927(c)(2) (2012).

Where mental health treatment is at issue, the "longitudinal picture" takes on added significance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). "A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015).

If the ALJ does not assign controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so, and "comprehensively set forth [the] reasons for the weight

assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also* 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). In particular, the ALJ must consider "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii) (2012), 416.927(c)(2)(i)-(ii) (2012) (ALJ must consider length of treatment relationship, frequency of examination, and how much "knowledge a treating source has about your impairment(s)").

Even assuming a sustained treatment relationship and appropriate credentials, however, the ALJ may discount a treating physician's opinion if it "lack[s] support or [is] internally inconsistent." *Duncan v. Astrue*, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011); *accord Lacava v. Astrue*, 2012 WL 6621731, at *12 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012). Similarly, "[w]hen other substantial evidence in the record conflicts with the treating physician' s opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Here, plaintiff challenges the weight accorded to the opinions of two medical sources: Dr. Lubrano and Dr. Sternman. Pl. Mem. at 15-19.[10]

---

[10] In the same section of her brief, plaintiff also challenges the ALJ's decision not to incorporate certain of Dr. Mahony's findings in his RFC determination, despite having given Dr. Mahony's

The ALJ acknowledged that Dr. Lubrano was plaintiff's "treating psychiatrist" (R. 23), but rejected portions of his October 2014 Medical Source Statement, including Dr. Lubrano's assertion that plaintiff had a "marked to extreme loss of ability to perform every enumerated mental task" printed on the form, as well as his opinion that plaintiff did not have the ability "even to mak[e] simple work-related decisions, travel to unfamiliar places, or be aware of normal hazards – and has had this degree of restriction since at least 1998." (R. 24.)

The Court finds no error in the ALJ's weighing of Dr. Lubrano's opinion. In according that opinion little weight, the ALJ permissibly relied on "normal findings throughout Dr. Lubrano's mental health treatment records" (R. 28; *see also* R. 25), as well as Dr. Lubrano's GAF assessments of 55 and 70. (R. 29.) *See Lamond v. Astrue*, 440 F. App'x 17, 21 (2d Cir. 2011) (upholding ALJ's determination where a treating physician's opinion "was inconsistent with his own treatment notes," as well as with other medical opinions in the record); *see also Maldonado v. Colvin*, 2017 WL 775829, at *18 n.17 (S.D.N.Y. Feb. 28, 2017) (finding no error where an ALJ considered plaintiff's GAF score of 60 as one of several factors in declining to give a treating physician's opinion controlling weight). The ALJ also permissibly accorded more weight to Dr. Lubrano's narrative conclusions than those assessed via check mark, after finding that the two were internally inconsistent. (R. 28.) *See Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent.") (citations omitted). Further, the ALJ properly discounted Dr. Lubrano's opinion that plaintiff's condition "existed and persisted," with the restrictions he identified, "at least since 1998" (R. 1020), given that plaintiff's earnings records reveal that she worked at least intermittently between 2000 and 2010 (R. 565),

opinion "substantial weight." *Id.* at 19-20. Because plaintiff's challenge is not in fact to the weight afforded Dr. Mahony, but to the ALJ's RFC determination, it is addressed in section V(F), below.

and was able to complete extensive activities of daily living during that time. (*See*, *e.g.*, R. 1003 (reporting that plaintiff was able to cook, clean, shop, do the laundry, shower, dress, and bathe independently).)

It is true that the ALJ did not explicitly address every factor listed in 20 C.F.R. §§ 404.1527(c) (2012) and 416.927(c) (2012). He did not, for example, explicitly detail how Dr. Lubrano's findings were significantly more severe than those of the other nine physicians who opined on plaintiff's condition. However, the Decision makes that point clear enough. (*See* R. 27-29.)[11] A detailed discussion of each factor is not required, so long as the ALJ provides "'good reasons' for the weight she gives to the treating source's opinion." *Halloran,* 362 F.3d at 32-33 (quoting *Schaal,* 134 F.3d at 505). *See also Atwater v. Astrue,* 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

The ALJ also did not err in according little weight to "Dr. Lubrano's June 2012 report stating that the claimant was unable to work for at least 12 months" as conclusory and opining on an issue reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1) (2012), 416.927(d)(1) (2012) ("We are responsible for making the determination or decision about whether you meet the

---

[11] Plaintiff suggests that Dr. Lubrano's opinions were supported by "the reports of other physicians in the record," citing (1) the treatment notes of physician Carl St. Preaux, M.D., who treated plaintiff but provided no formal opinion about her condition (*see, e.g.,* R. 1067-69), (2) the opinion of FEGS physician Oksana Luke, M.D., who completed a FEGS form in July 2010, before the period at issue (R. 751-59), (3) the opinion of FEGS social worker Agatha Irish (who was not an "acceptable medical source" under 20 C.F.R. §§ 404.1513(a) and 416.913(a)) (*see* R. 760-76), and (4) the opinion of Dr. Lee (who identified only minimal limitations to plaintiff's ability to work) (R. 926-29). Pl. Mem. at 17-18. The ALJ reasonably accorded these opinions less weight than those of plaintiff's treating neurologists and the consultative examiners who examined plaintiff during the relevant period.

statutory definition of disability. . . . A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.").

Plaintiff next argues that the ALJ erred by refusing to consider Dr. Sternman a treating physician and by failing to give "great weight to Dr. Sternman's report that Ms. Lebron was not a malingerer, that her symptoms were severe enough to interfere frequently with her attention and concentration, and that she could not work in a competitive environment on a sustained full-time basis." Pl. Mem. at 15-16.

Dr. Sternman treated plaintiff three times: July 23, 2014, July 22, 2015, and September 30, 2015. (R. 1036-37, 1146-47, 1276-78.) On July 22, 2015, the same date as the second visit, he completed the Seizures Impairment Questionnaire plaintiff relies on here. (R. 1123.)

The Court finds no error in the ALJ's treatment of Dr. Sternman. A physician who has examined a claimant only once or twice is generally not afforded the weight due a treating physician. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (opinion of physician "who only examined Mongeur once or twice" was not "entitled to the extra weight of that of a 'treating physician'"). That is especially so here, where Dr. Sternman hedged his opinions by stating that it was "not yet known" whether plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in his evaluation. (R. 1121.) Moreover, the ALJ properly accorded less weight to the Seizures Impairment Questionnaire completed by Dr. Sternman than to the Seizures Impairment Questionnaire completed by Dr. Burger (R. 1012-15), who treated plaintiff at the same facility, more frequently, and for a longer period of time. (*See* R. 953-55, 957-58, 967-69, 1012-15, 1061-62, 1064-65.)

### E.     The ALJ Did Not Rely on the Materiality of Plaintiff's Substance Abuse

Plaintiff next asserts that "the ALJ erred in stating that even if he had found Plaintiff unable to work, he would find that this was due to her substance abuse." Pl. Mem. at 20. It is clear from the Decision, however, that this was dicta; the ALJ did not "find that the claimant is 'disabled,'" and therefore, in accordance with SSR 13-2P, 2013 WL 621536 at *4 (Feb. 20, 2013), did not "reach the question of the materiality of her substance abuse." (R. 27.) For the same reason, the Court will not reach the materiality issue.

### F.     The ALJ Did Not Err in His Step Five Determination

At step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do. 20 C.F.R. §§ 404.1560(c)(1)-(2), 416.960(c)(1)-(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. Pt. 404, Subpt. P, App'x 2, typically guide this evaluation, placing claimants with exertional limitations into categories according to their exertional capabilities (*e.g.*, sedentary, light, or medium work), age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). However, "[w]hen a claimant suffers from a nonexertional limitation such that he is 'unable to perform the full range of employment indicated by the [Grid],' or the Grid fails 'to describe the full extent of a claimant's physical limitations,' the Commissioner must introduce the testimony of a vocational expert in order to prove 'that jobs exist in the economy which claimant can obtain and perform.'" *Rivera v. Colvin*, 2015 WL 1027163, at *11 (S.D.N.Y. Mar. 9, 2015) (quoting *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005), and *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)).

Though plaintiff frames her step five argument as a challenge to the ALJ's decision not to call a vocational expert, her argument is two-fold. First, plaintiff challenges the ALJ's determination of her RFC, asserting that it failed to account for various non-exertional limitations. Pl. Mem. at 22, 22 n.23. Second, she argues that, in light of those non-exertional limitations, the ALJ erred in relying on the Grids and in failing to seek the testimony of a vocational expert to determine whether jobs exist which plaintiff can obtain and perform. *Id.* at 22-23.

### 1.  Substantial Evidence Supported the ALJ's RFC

As noted above, plaintiff's RFC is the most she can still do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including her credible testimony, objective medical evidence, and medical opinions. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

Plaintiff argues that the ALJ's RFC determination failed to account for "the side effects of her many medications," "the time she would be off-task because of the seizures," that "she would sometimes need to lie down at unpredictable intervals several times monthly, for one to two hours," and her "significant mental limitations, as well as seizures." Pl. Mem. at 22, 22 n.23. She also argues that the ALJ failed to incorporate all of the mental limitations identified by Dr. Mahony, despite having accorded Dr. Mahony's opinion substantial weight. Pl. Mem. at 19-20.[12]

The question for this Court is whether the RFC's limitation to "simple routine and repetitive work tasks, with no exposure to heights or dangerous machinery" (R. 20) fully accommodated plaintiff's mental and other non-exertional limitations. The Court finds that the ALJ's RFC determination was supported by substantial evidence.

---

[12] The Court has already addressed the weight accorded to the medical sources in the record and the ALJ's assessment of plaintiff's credibility. *See, supra*, section V(B) n.8; section V(D).

Substantial evidence supported the ALJ's omission of any limitation based on the side effects of plaintiff's medications. Indeed, the record contains little evidence of any side effects. Dr. Lubrano's October 16, 2014 Medical Source Statement listed plaintiff's medications and noted side effects of "dizziness, drowsiness, [and] fatigue" (R. 1017), but plaintiff herself repeatedly reported no side effects of her medications to Dr. Lubrano and other professionals during the relevant period. (R. 716, 1159, 1167, 1199, 1207, 1211, 1225, 1238, 1289, 1388, 1392, 1394, 1416, 1432, 1447, 1465, 1468, 1471, 1474.)

The same is true concerning plaintiff's needs to be "off-task" and "to lie down at unpredictable intervals several times monthly, for one to two hours," as a result of her seizures. As plaintiff notes, both Dr. Burger and Dr. Sternman opined that plaintiff would need to "lie down or rest at unpredictable intervals during an 8-hour workday." (R. 1014, 1122.) Dr. Sternman noted this would happen "several times monthly," and plaintiff would need to rest two hours before returning to work. (R. 1122.) However, Dr. Burger opined this would happen only "sometimes," and plaintiff would need to rest only one hour before returning to work. (R. 1014.) These approximations aligned with Dr. Burger's finding at the time that plaintiff suffered one seizure per month, and Dr. Sternman's notation that plaintiff suffered four per month. (R. 1012, 1120.) The ALJ permissibly found that plaintiff did not establish that she had seizures once a month despite adherence to prescribed treatment. *See*, *supra*, section V(C). It was therefore reasonable for the ALJ to conclude that plaintiff would not need the breaks caused by those seizures "several times monthly," and that a break of one hour "sometimes" – as found by Dr. Burger – would not significantly limit her range of work.

Substantial evidence also supports the ALJ's determination that a limitation to "simple routine and repetitive work tasks" accommodated plaintiff's mental limitations, and that she

retained the capacity to "understand and carry out instructions, maintain attention and concentration, interact appropriately with supervisors, coworkers and the public, and keep a regular schedule." (R. 20.) Dr. Rupp-Goolnick and Dr. Mahony each found that plaintiff had no limitation in her abilities to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule. (R. 1010, 1152.) Dr. Kamin too found that plaintiff had no limitations in her ability to understand and remember locations, work-like procedures, and very short and simple instructions. (R. 286.) Though Dr. Mahony found that plaintiff had moderate difficulties relating to others in the workplace, Dr. Rupp-Goolnick found no such limitations. (R. 1010, 1155.) And though Dr. Kamin found that plaintiff had moderate limitations in her ability to respond appropriately to changes in her work setting, Dr. Rupp-Goolnick found none. (R. 287, 1155.)

For the same reasons, the Court finds no error in the ALJ having accorded Dr. Mahony substantial weight but not having incorporated every mental limitation found by Dr. Mahony into plaintiff's RFC. As plaintiff notes, Dr. Mahony found that plaintiff's attention, concentration, and memory skills were impaired. (R. 1010.) Dr. Mahony also found that plaintiff had "moderate difficulties learning new tasks, performing complex tasks independently, making appropriate decisions, relating to others, and dealing with stress," and attributed those difficulties to "substance abuse, psychiatric, and cognitive problems." (*Id.*) Dr. Mahony further found that those problems would "interfere with the claimant's ability to function on a daily basis." (*Id.*)

However, Dr. Mahony also opined that there was "no evidence of limitation in the claimant's ability to follow and understand simple directions and instructions, perform[] simple tasks independently, maintain[] attention and concentration, or maintain[] a regular schedule." (R. 1010.) The ALJ's RFC determination was consistent with that opinion. Admittedly, the RFC did

not explicitly address Dr. Mahony's views regarding plaintiff's difficulties "making appropriate decisions, relating to others, and dealing with stress." (*Id.*) However, the ALJ's omission of any reference to those difficulties was supported by substantial evidence, including Dr. Rupp-Goolnick's opinion that there was "no evidence of limitation" to plaintiff's abilities to "make appropriate decisions, relate adequately with others, and appropriately deal with stress." (R. 1152.) While medical sources may provide opinions concerning the claimant's specific functional limitations, *see* SSR 96-5p, 1996 WL 374183 (July 2, 1996), it is the ALJ who is ultimately tasked with determining a claimant's RFC, which he must do based on the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(2) (2012), 404.1545(a)(3), 404.1546(c), 416.927(d)(2) (2012), 416.945(a)(3), 416.946(c). The Court cannot say that the ALJ erred in doing so here.

### 2. The ALJ Did Not Err by Relying on the Medical-Vocational Guidelines

Having determined that the ALJ's RFC determination was supported by substantial evidence, the Court must decide whether the ALJ erred in relying on the Grids in concluding that someone with plaintiff's RFC, age, education, and work experience could perform work existing in significant numbers in the national economy.

"Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava*, 2012 WL 6621731, at *18 (citing *Acevedo v. Astrue*, 2012 WL 4377323 (S.D.N.Y. Sept. 4, 2012) and *Giannasca v. Astrue*, 2011 WL 4445141 (S.D.N.Y. Sept. 26, 2011)). On the other hand, if the ALJ properly concludes that the non-exertional limitations "do not significantly limit the claimant's ability to do work," then "a vocational expert is unnecessary." *Reyes v. Colvin*, 2015 WL 337483, at *15 (S.D.N.Y. Jan. 26, 2015). In order to determine whether the ALJ erred by failing to obtain expert vocational testimony, the Court "must determine whether there is substantial evidence in the record to support the ALJ's conclusion" as

to the impact of the non-exertional limitations. *Reyes*, 2015 WL 337483, at *15 (citing *Acevedo*, 2012 WL 4377323, at *14).

Non-exertional limitations may be mental, postural, auditory, visual, or environmental. SSR 85-15, 1985 WL 56857, at *1-8 (Jan. 1, 1985). A non-exertional limitation "significantly" limits the range of work if it "so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Selian*, 708 F.3d at 421 (quoting *Zabala*, 595 F.3d at 411).

In determining whether a claimant's mental impairments "significantly" limit her range of work, the ALJ "must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." SSR 85-15, 1985 WL 56857, at *4. "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.*

The Court finds no error in the ALJ's step five determination. As an initial matter, plaintiff's limitation to "simple routine and repetitive work tasks" (R. 20), did not significantly limit her ability to work. As the Second Circuit has held, an ALJ is not required to call a vocational expert based on a claimant's mental limitations so long as that claimant remains capable of performing the "basic mental demands of unskilled work." *Selian*, 708 F.3d at 422 (quoting *Zabala*, 595 F.3d at 411). Similarly, the ALJ correctly determined that plaintiff's environmental limitation to "no exposure to heights or dangerous machinery" did not significantly diminish her ability to perform light work because, as plaintiff correctly acknowledges, "restrictions against

unprotected heights and proximity to dangerous or moving machinery are not significant at any exertional level." (R. 30.) *See also* SSR 85-15, 1985 WL 56857, at *8 ("A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels."); *Gonzalez*, 2008 WL 4453166, at *9 ("The ALJ in this case correctly assessed that plaintiff's environmental limitations against heights, machines, and driving did not significantly limit his employment opportunities.").

Because the ALJ permissibly found that plaintiff's non-exertional limitations had little or no effect on the occupational base of unskilled work available to her, the ALJ did not err in relying on the Medical-Vocational Guidelines as a framework in finding Plaintiff not disabled. *Zabala*, 595 F.3d at 411; *Andrews v. Comm'r of Soc. Sec.*, 2017 WL 6398716, at *13 (S.D.N.Y. Oct. 24, 2017), *report and recommendation adopted*, 2017 WL 6398727 (S.D.N.Y. Dec. 13, 2017).

### G.     Plaintiff Was Not Denied A Full and Fair Hearing

When deciding a challenge to a denial of disability benefits, the reviewing court must satisfy itself that a claimant "has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). If the court determines that the claimant did not receive a fair and adequate hearing before the ALJ, it must remand the case to the Commissioner. *Watson v. Astrue*, 2009 WL 6371622, at *5 (S.D.N.Y. Feb. 4, 2009), *report and recommendation adopted,* 2010 WL 1645060 (S.D.N.Y. Apr. 22, 2010).

Plaintiff Lebron asserts that ALJ Grossman denied her a full and adequate hearing by (1) "not admit[ting]" that he had an obligation to help develop the record, (2) stating that he did not believe plaintiff could "cough up the $20" to pay for requested medical records, (3) unjustifiably

accusing her of minimizing the amount of English she spoke, and (4) threatening, upon plaintiff's departure from the January 11, 2017 hearing, to "ignore" her testimony because she had not yet "subjected herself to . . . a cross-examination." Pl. Mem. at 23-24.

Plaintiff's arguments are unavailing. She identifies no evidence missing from the record as a result of the ALJ's statements to plaintiff's counsel regarding development of the record. Further, the ALJ did not question plaintiff's ability to pay $20 at the August 17, 2016 hearing. Rather, he questioned her law firm's ability to advance that amount. (R. 245.)[13] The ALJ's statement, during colloquy with plaintiff's counsel, that plaintiff was "minimizing the amount of English that she speaks" (R. 179) was perhaps inappropriate, but did not amount to deprivation of a full and fair hearing. Finally, the ALJ did not threaten to "ignore" plaintiff's testimony after she decided to leave the January 11, 2017 hearing (because, as she said, the ALJ was asking "too many dumb questions"). (R. 187.) Instead, he said that he was "not sure" that he could credit "any of her testimony either because she can't have it both ways." (R. 190.) He then clarified that "I will take into account what she said but I'm going to put more weight on the medical records." (*Id.*) In any event, the Decision did take plaintiff's testimony into account. (R. 21.)

The Court is somewhat troubled by the extended back and forth between plaintiff's counsel and the ALJ over the course of four hearings in this case, which frequently kept the claimant herself waiting, and at times became acrimonious. (*See* R. 163-73, 189-97, 201-12, 216-20, 231-36, 239-47.) Nevertheless, the ALJ cannot be faulted for plaintiff's failure to appear at one hearing (R. 239), nor for her voluntary departure from another in the middle of questioning by her own attorney. (R. 187.) Moreover, plaintiff's counsel confirmed that plaintiff waived her right to any

---

[13] The ALJ stated: "I've gotten things from your firm that cost $20 and therefore we should subpoena them. Okay, we do it, I mean personally don't believe that somebody can't cough up the $20, that your firm can't advance $20." (R. 245.)

further hearing (R. 188), and the ALJ based his Decision on the testimony plaintiff did provide as well as a 1,677-page record. On these facts, and this record, the Court cannot conclude that plaintiff was deprived a full and adequate hearing. *See Brogan v. Comm'r of Soc. Sec.*, 671 F. App'x 12, 13 (2d Cir. 2016) ("we are not persuaded that those stray remarks – though ill-advised – manifest a deep-seated favoritism or antagonism that would make a fair judgment impossible") (citations and quotation marks omitted); *Nunez v. Berryhill*, 2017 WL 3495213, at *22 (S.D.N.Y. Aug. 11, 2017) (ALJ's stray remarks and interruptions did not amount to deprivation of a full and fair hearing).

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED, plaintiff's motion is DENIED, and the case is DISMISSED.[14]

Dated: New York, New York
       March 29, 2019

SO ORDERED.

**BARBARA MOSES**
**United States Magistrate Judge**

---

[14] To the extent plaintiff believes she is now able to meet her burden to show that she meets Listing 11.02(A) (*i.e.,* that she has been adhering to prescribed treatment and still has seizures at least once per month), or if she believes that her condition has otherwise deteriorated (such that she is now disabled as that term is used in the Act), she may file a new application for benefits alleging disability beginning *after* the date of ALJ Grossman's Decision. *See DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) ("DeChirico is, of course, free to file a new application for benefits, pursuant to the relevant regulations, and to present new evidence of his disability at that time."); *Faucette v. Comm'r of Soc. Sec.*, 2015 WL 5773565, at *19 (S.D.N.Y. Aug. 8, 2015) ("plaintiff is free to file a new application . . . for the period following the ALJ's decision and may present new evidence of his disability at that time"), *report and recommendation adopted*, 2015 WL 5773565, at *1 (S.D.N.Y. Sept. 30, 2015).